Filed 8/23/24  In re C.F. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re C.F. et al., Persons Coming Under the Juvenile Court Law. | H051649 (Santa Cruz County Super. Ct. Nos. 23JU00005, 23JU00006) |
| SANTA CRUZ COUNTY HUMAN SERVICES DEPARTMENT, Plaintiff and Respondent, v. M.F., Defendant and Appellant. | |

## I.  INTRODUCTION

M.F., father of the two children at issue here, appeals from juvenile court judgments terminating jurisdiction over the children, dismissing dependency, and making certain custody and visitation orders.  (Welf. & Inst. Code, § 362.4.)[1]  Regarding the judgment concerning daughter C.F. (case No. 23JU00005), father does not raise any issue on appeal.  Regarding the judgment concerning son D.F. (case No. 23JU00006), father contends the trial court abused its discretion in awarding sole physical custody of son to

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

mother.  As we determine that the record supports the juvenile court's order, and father has not shown an abuse of discretion, we will affirm the judgment.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A. *Petitions, Detention, and Jurisdiction in Butte County (August – September 2022)*

On August 30, 2022, the Butte County Department of Employment and Social Services, Children's Services Division (Butte County Department) filed petitions under section 300, subdivisions (b)(1) [failure to protect] and (g) [no provision for support], alleging that daughter, then aged 12, and son, then aged eight, came within the jurisdiction of the juvenile court.  The children had been living with father, and mother was living out of state.  The petition alleged that father had been arrested and that the children were left without any provisions for care and support.  After father was released from jail, he took the children from their placement, and the children's whereabout were unknown.[2]

The juvenile court issued protective custody warrants for the children.  (§ 340.)  In a declaration in support of the warrants, the social worker explained that a forensic interview of the children was conducted on August 29, 2022.  The interview pertained to allegations of physical and sexual abuse that occurred one year prior.  The children were not interviewed sooner because mother had fled with the children to Arkansas after a protective custody warrant was issued for the children to be removed from mother's care.  Father was granted legal and physical custody of the children, and he was able to retrieve the children from Arkansas.  During the forensic interview, the children immediately asked to leave and at times refused to make eye contact or answer questions.  Father acknowledged to law enforcement that he had instructed the children not to cooperate.  Father was arrested for dissuading a witness but released around 5:30 p.m. the same day.

---

[2] Amended petitions regarding the children were subsequently filed to correct a typographical error.

When father contacted the department after hours about getting his children back, he was informed that the assigned social worker would call him in the morning. Father, however, took the children from their designated placement later that night without authorization.

The children were located and taken into protective custody on September 2, 2022.

A detention hearing for the children was held on September 7, 2022, and both father, who had been taken into custody, and mother were present at the hearing. The juvenile court appointed counsel for the children, for father, and for mother. The juvenile court ordered the children detained.

At the jurisdiction hearing on September 29, 2022, the juvenile court sustained the allegations of the petitions, and set the matters for disposition. Father requested "jail visits" with the children, but there was a criminal protective order in place prohibiting contact.

**B.** *Disposition (October – November 2022)*

The Butte County Department initially recommended in an October 2022 disposition report that the children be declared dependents and that family reunification services be offered to mother and father. Regarding prior child welfare history, the Butte County Department explained that approximately a year prior, on August 12, 2021, the children were residing with mother in a house containing weapons and drug paraphernalia with drug residue. When mother was informed that the children were going to be detained, she fled with them out of state. Earlier allegations of general neglect or abuse (physical, emotional, and/or sexual) between 2011 and 2021, against father and/or mother were found inconclusive. The children were currently placed with their paternal grandparents, but the children would not be able to continue there much longer. Both children had a "long history of witnessing domestic violence" between their parents.

3

Mother had in-person visits with the children, and they were scheduled to have monitored virtual visits. The children enjoyed spending time with mother. Mother had no prior criminal convictions. She relocated from Arkansas to California to participate in the children's dependency cases, and she allowed the Butte County Department to conduct a walkthrough of her home in Santa Cruz County. She was attending "Parent Engagement Counseling," which she enjoyed participating in. Mother reported that she occasionally consumed alcohol and that she never used drugs. She twice tested negative for substances in September 2022.

Father remained in custody since his arrest for child abduction, and the children had had no contact with him due to the criminal protective order. Father had previously been convicted of two infractions and two misdemeanors between 1991 and 2020. He was currently being held on charges of child abduction and dissuading a witness. Father denied using drugs and reported consuming alcohol only occasionally. He appeared to love and miss the children.

The disposition hearing was held over multiple days in October and November 2022. At an October hearing, counsel for the children requested that the Butte County Department be given discretion to have the children returned to mother on an extended visit. The court juvenile court granted the request. By November 2022, the children were living with mother in Santa Cruz County and enrolled in school.

At the continued November 2022 disposition hearing, the Butte County Department recommended that family maintenance services, instead of family reunification services, be ordered for mother and the children. The department intended to request a transfer of the case to Santa Cruz County to facilitate random drug testing of mother. Father's counsel indicated that father was "supportive of the change of recommendation to family maintenance with mother" and that father believed the children were safe with mother "if she remains clean and sober." The children's counsel indicated that the children also "wanted to go home" in reference to staying with mother.

4

The juvenile court adjudged both children to be a dependent child.  The court removed the children from the physical custody of father, ordered both children to be placed with mother, and ordered family maintenance services according to the family's case plan.  The court also authorized substance abuse testing of the parents.

**C.  *Transfer to Santa Cruz County (early 2023)***

The children's cases were transferred from Butte County to Santa Cruz County in early 2023.  At a hearing on March 2, 2023 after the transfer, the juvenile court in Santa Cruz County was informed that father had pleaded to two of four counts in his criminal case in November 2022, was sentenced, and was released from custody on March 1, 2023.  At the time of the March hearing, father was still in Butte County, while the children resided in Santa Cruz County with mother.  The juvenile court ordered the parents to participate in the case plan prepared by the Santa Cruz County Human Services Department (Santa Cruz Department).  As the criminal court had modified a protective order to allow peaceful contact by father with children, the juvenile court authorized father to have visitation a minimum of one time per week, supervised, and initially by remote means.  The social worker was given discretion to increase the frequency and duration of the visits.

**D.  *Six-Month Family Maintenance Review (May 2023)***

In an April 2023 report, the Santa Cruz Department recommended that mother continue to have full physical care of the children, and that father have a minimum of two supervised visits per week.  The children were happy in school and at home.  Daughter was in seventh grade, performing "academically above average," and on the school volleyball team.  Son was in third grade, got along with peers, and liked his teacher.  Mother and children displayed affection and had open communication with each other during visits by the social worker.  Mother was attending therapy and starting a new job.  Her case plan included drug testing "on a 'upon suspicion' basis," but there was no indication that mother was using substances and she had never raised any objection to

5

testing or to the fact that it had remained a part of her case plan. Father continued to reside in Butte County and also started a new job. He was participating in therapy and had "made it clear that his top priority is reunification with his children." Father had been assigned a probation officer for his criminal case, and father was expected to begin a 52-week class to address child endangerment through Butte County probation. Father had an in-person "heartfelt reunion" with the children and was also visiting with them virtually. The Santa Cruz Department recommended that an additional six months of family maintenance services be offered to mother and father, and that an interim review hearing be set in three months. If mother continued to "safely parent the children and engage in her services," the department believed there was "a substantial probability that [it could] recommend a dismissal at the interim review hearing." Regarding father, the department wanted him to "continue to engage in his case plan services and see his children virtually/in-person with the plan to move him to a lower level of supervision by the next court hearing."

The six-month family maintenance review hearing was held on May 4, 2023. The juvenile court ordered that family maintenance services continue, with the children residing with mother and visitation by father. Father intended to relocate to the Santa Cruz area and wanted increased visitation with the children. The court authorized visitation twice per week, supervised, virtual or in person, with the social worker having the discretion to increase the frequency and duration or adjust the level of supervision. The court scheduled an interim review hearing for July to consider dismissal of the matters, and also scheduled another six-month family maintenance review for October 2023.

Father was apparently living in Santa Cruz County by June 2023. In early July 2023, the Santa Cruz Department filed a notice indicating that it was recommending continued family maintenance services for the family and recommending that the parents

6

be referred to mediation to address visitation.  At a July 27, 2023 interim review hearing,[3] the juvenile court referred the matters to mediation regarding visitation.  A mediation was conducted on August 17, 2023, but no agreement resulted from the mediation.

### E.  *Protective Custody Warrant and Section 388 Petition (September 2023)*

On September 6, 2023, the Santa Cruz Department filed a memorandum stating that daughter's whereabouts were unknown.  Mother and daughter reportedly were involved in a physical altercation on August 30, 2023, when daughter attempted to get her cell phone back from mother.  The altercation resulted in daughter's finger being injured.  Daughter thereafter spent a night and a day with father.  The department interviewed daughter and family members on August 31, 2023.  The department reported that it was planned for daughter to stay with a friend through the weekend "to allow for some time for the family to clear their heads and get a break from each other."  On September 5, 2023, daughter told the department that she was not in school.  The department had been working with mother to make a plan for daughter.  Mother had asked daughter to go to her uncle's home, but daughter had refused.  Daughter also refused to tell the department where she was staying.  Father denied having daughter in his care, and he reported that she was unsafe and on the streets.  A missing person's report was apparently filed by mother.  The Santa Cruz Department requested that a warrant be issued detaining daughter and that she be returned to mother's care.  On September 6, 2023, a protective custody warrant was issued for daughter.

At the request of the children's counsel, daughter's case was placed on calendar for a hearing, which took place on September 21, 2023.  Daughter appeared at the hearing remotely.  Her whereabouts remained unknown although she was in contact with her counsel.  Daughter indicated that she had not been attending school because she was afraid of being picked up on the protective custody warrant.  She wanted to have a

---

[3] No reporter's transcript of the hearing is contained in the record.

"two-week visit" with father. She offered to "go straight to [her] dad's house" if the warrant was lifted. Father, who appeared at the hearing remotely, stated that daughter had been "bouncing friends to friends." Father wanted daughter placed in his custody, while mother wanted daughter returned home. The Santa Cruz Department did not agree with "any type of safety plan that involve[d] a long-term placement with" father because, among other things, it "took some time for him to agree to the drug testing." The juvenile court observed that to remove daughter from her most recent placement, which was with mother, a written request with supporting evidence needed to be presented to the court. The court was "not going [to] sua sponte on [its] own volition commence an unsupervised visit" between father and daughter without any evidence. The court went off the record and held an unreported discussion in chambers with all counsel and the social worker. After returning on the record, the court stated that the protective custody warrant would remain in place. The court explained that if daughter appeared at an in-person child and family team meeting (CFT) and there was an identified emergency placement, then the court would lift the protective custody warrant with the emergency placement. The court also noted that father had not agreed to the department's request for another drug test, which was in his case plan, which itself was part of the court's order. The court indicated that father's refusal to comply could affect "the prospects of his long-term successful reunification." The court scheduled a review hearing for September 28, 2023, regarding the status of emergency placement.

In the meantime, on September 27, 2023, the children's counsel filed, on behalf of daughter, a request for change of order pursuant to section 388 (section 388 petition) that the protective custody warrant be lifted and that the social worker be allowed to exercise discretion to permit daughter to have unsupervised and extended visits with father. Counsel reported that the day prior, on September 26, 2023, daughter attended "a CFT meeting and a plan was created to have her in a safe place and back to school. [Daughter] will stay with a friend [who] the [social worker] has approved. She will

8

return to school.  She will have visits with her father, and she will not be forced to see her mother."  However, the children's counsel further stated, "We thought this plan [for daughter to stay with a friend's family] would be beginning tonight but just received a call from father who states that [daughter] has been out of county and is hours away.  [¶] He is planning on picking her up tomorrow and assures all that she will be at [the friend's] home by tomorrow evening."

At the September 28, 2023 review hearing, the Santa Cruz Department reported that daughter had gone to her friend's home and was attending school.  As the department believed daughter was in a safe place consistent with the plan made at the recent CFT, the department requested that the juvenile court recall the protective custody warrant. Father's counsel indicated that father had picked up daughter and brought her to the place where she was currently staying.  Mother's counsel indicated that mother disagreed with the safety plan and wanted daughter returned to her care.  The court agreed with the department's recommendation and recalled the protective custody warrant, referring to the facts that "[w]e do know where [daughter] is" and "[s]he is in school."  Regarding daughter's section 388 petition for unsupervised and extended visits with father, the court set the matter for a hearing on October 26, 2023.

**F.** *Twelve-Month Family Maintenance Review (October-December 2023)*

**1.  Santa Cruz Department's Twelve-Month Status Review Report**

In an October 6, 2023 status review report, the Santa Cruz Department recommended that dependency be dismissed for both children.  The department further recommended that (1) the parents share legal custody of both children, (2) the parents share physical custody of daughter, and (3) mother retain sole physical custody of son with father receiving a minimum of two unsupervised overnight visits per week.

The Santa Cruz Department explained that father had been granted unsupervised visits at the end of June 2023 with both children.  After issues arose regarding visitation and other matters, both parents were asked to test for substances in mid-July 2023.

9

Mother tested immediately and the results were negative. Father continued to refuse to test until his visits were moved back to supervised status in late August 2023, and he was told that he could not proceed with unsupervised or overnight visits. After he completed two consecutive negative tests and allowed a home visit, his unsupervised visits resumed by September 11, 2023 with son, who continued living with mother.

Regarding the late August 2023 incident between mother and daughter involving an altercation over a cell phone, the Santa Cruz Department conducted an investigation but found the report of mother's physical abuse of daughter inconclusive. Text messages between father and daughter indicated that daughter had " 'swung on' " mother, that father agreed to daughter's request to be picked up although his visits were required to be supervised, and that father used vulgar language to refer to mother. Through most of September 2023, daughter's whereabouts were unknown to mother and the Santa Cruz Department. Daughter refused to live with or see mother. Father at times knew where daughter was, but he refused to provide the information. Starting in late September, after a CFT meeting, daughter stayed with a friend's family. It was anticipated that daughter would begin an extended visit with father on October 9 or 10, 2023. Mother disagreed with unsupervised visits between daughter and father. Son expressed sadness about the current relationship between his sister and mother. He missed his sister and wanted her to come home.

Daughter was in junior high school. Prior to the recent period in which she missed a lot of school, she had been functioning academically above average and reported liking school. However, after missing so much school, she needed to work with her teachers and school staff to get back on track academically. Daughter had consistently attended weekly therapy sessions throughout the summer, but those sessions stopped after daughter's whereabouts were unknown. In early October 2023, father indicated that he could not get daughter to therapy during office hours and that his daughter had no

10

intention of participating in telehealth.  He stated that he would look into private insurance to obtain therapy for her.

Son was in elementary school.  Although he had a "hard start" at the beginning of the year, with teacher intervention son's attitude improved and he was generally performing at grade level.  He did not appear to have a need for individual therapy beyond the sessions that he attended earlier in the year.

Mother had been attending weekly counseling sessions.  She recognized the importance of the children having a "regular schedule of mealtimes[ and] bedtime routines consistent with school nights and quality time together."  Mother showed no indication that she had a substance use disorder, she voluntarily tested negative in mid-July 2023 after she requested that father also be tested, and she again tested negative in late September 2023.

Father participated weekly in individual therapy services, where the well-being of the children had been "a priority and a primary subject."  Father had been compliant with the terms of his probation according to a Butte County probation officer, including by completing 12 of 52 weekly sessions so far for a class addressing child endangerment.  It was anticipated that a probation officer in Santa Cruz County would be assigned shortly.  Father last tested negative for substances in early September 2023.  After being asked to test again in late September 2023, father was "adamant that he is unable to make the time" and that there was no reasonable suspicion to indicate it was necessary.

Regarding visitation, prior to August, "both children had expressed wanting shared time with both parents and have experienced confusion and frustration with the inconsistencies around their visits with their father."  Son recently reported that "he would like to spend quality time with his father and have at least one visit a week, as well as [an] overnight."  He reported "feeling safe with both his parents and . . . want[ed] to have a set schedule to allow this."

11

The Santa Cruz Department reported that the parents "continued to struggle with communication regarding the care of" the children. For example, father allowed daughter to get her nose pierced, while mother believed daughter was too young to make the decision. Father also apparently failed to accurately communicate with mother regarding medical care for son. Father believed that the children's schools were not informed that he was allowed to attend school functions and meetings, but mother eventually updated the school about both parents holding educational rights. Mother reported that father, in speaking to son, used vulgar language to refer to the child's older half-sister. A social worker had "conversations with [father] about the way that he speaks negatively to his children about people they care about."

The Santa Cruz Department determined that "[a]lthough continued conflict remain[ed] between both parents, these issues do not fall in the [purview] of dependency court. Both parents struggle[d] to co-parent, respect one another and at times . . . put the children in the middle by hearing ill things about the other." Both parents had "remained engaged in their case plan services" and had "prioritize[d] time with their children," but the parents had "struggled greatly in their communication and trust with [each] other as co-parents." The parents had reportedly "been before a Family Law Court over 40 times," which showed "the difficulty they have had working together historically as co-parents." The department further stated, "Despite mediation this family has struggled to agree upon shared time with their children and will need a very specific exit order as to how their shared time with their children will look. Currently both [parents] share worry that each parent will alienate the other from seeing their children. It is truly hoped that [the children] can adjust into a regular schedule in both homes and that safety and wellbeing will continue to be in the forefront for both parents."

### 2. Initial Hearing Regarding 12-Month Review and Section 388 Petition

On October 26, 2023, a combined hearing was held regarding the 12-month review and daughter's section 388 petition. The children and mother objected to the

Santa Cruz Department's recommendations regarding custody and visitation. The juvenile court set the cases for a settlement conference on November 16, 2023, and a contested hearing on December 6, 2023.

### 3. Post-Settlement Conference Hearing

At a hearing on November 16, 2023, the Santa Cruz Department informed the juvenile court that the settlement conference was unsuccessful and that the matters would proceed to the contested hearing. The court, which had been advised that a criminal matter was pending against father in Santa Cruz, stated that it had "reviewed the most recent police report that occurred in between the last two hearings" and that the court was "very concerned that we might be taking a step back instead of a step forward." The court further stated, "We are supposed to be dismissing this case -- or at least getting close to it. I feel that there are some blatant disregards for Court Orders, not just by one person, and I would not be in agreement with dismissal today without further conversation."

The juvenile court proceeded to confirm the upcoming contested hearing date and asked the Santa Cruz Department about visitation for the children. The department indicated that it was changing its recommendation regarding visitation by "moving back [son's] visitation to supervised at the Parents Center; this is following the recent November incident in which [father] tried to abscond with the children to Butte County. It will be at a rate of two times per week." Since father's recent release from custody, arrangements were being made to restart visitation between father and son. Regarding daughter, she was in father's custody "outside of the [o]rder of the [c]ourt," which originally provided mother with custody. Daughter was refusing to see mother, so visitation was not occurring.

## 4. Santa Cruz Department's Memorandum Updating the Court and Sheriff's Reports

Prior to the contested hearing, the Santa Cruz Department filed a December 5, 2023 memorandum updating the juvenile court as follows:

Daughter was currently in the care of father, and she continued to refuse to see mother. Daughter also continued to struggle in school, including being disrespectful, defiant, starting a fight, and being suspended for having a vape device. After father was arrested for violating his probation by absconding with the children, the department informed mother that she would need to ensure that daughter was cared for in father's absence. Daughter, however, refused to consider returning to mother's home.

Son was currently in the care of mother, and father had supervised visits twice a week. In early November 2023, when a social worker met with son at school in anticipation of him going home with mother after school, son was upset and indicated that he " 'just want[ed] to be in a shared custody agreement.' " That evening, mother told the Santa Cruz Department that son appeared more relaxed since being home.

The Santa Cruz Department concluded in its memorandum, "Although both children continue to be impacted by the conflict that occurs between their parents, the impact does not meet the criteria of abuse or neglect and at this point, the [Department] has assessed that continued child welfare involvement itself is detrimental. [Son] has been re-referred to Children's Behavioral Health services and was open[] to services pending assignment of a therapist. Therefore, the Department continues to respectfully recommend dismissal of these dependency matters." Regarding son, the Santa Cruz Department recommended that mother have sole physical custody, that the parents share legal custody, and that father have supervised, rather than unsupervised, visitation two times per week. Regarding daughter, the department recommended shared physical and legal custody, with visitation between mother and daughter a minimum of one time per month, unsupervised.

Attached to the Santa Cruz Department's memorandum were sheriff's reports pertaining to incidents occurring in October and early November 2023.

Regarding the October 2023 incident, father had an agreed-upon unsupervised visit with son for four hours. At the conclusion of the visit, mother picked up son and brought him home. At some point, mother discovered that son was no longer at home. A few minutes later, she received a call from father stating that he had son, that son did not want to stay with mother, and that he (father) was taking son back to father's residence. Mother contacted law enforcement. However, because mother could not produce a court order specifying that son was not allowed to be with father, law enforcement was limited to conducting a welfare check on son at father's residence. Son told law enforcement that he walked out of mother's residence and met father down the road. The next day, son did not attend school. A social worker confirmed to law enforcement that son needed to be returned to mother. After the social worker contacted father, he agreed to return son to mother later that day at 5:00 p.m. Law enforcement and the social worker were present for the exchange.

Regarding the early November 2023 incident, mother went to pick up son after school but he was not there. Unbeknownst to mother, daughter and son had taken a bus to father's residence. Mother called law enforcement and reported that father had taken son. When father was contacted by law enforcement, he stated that he was about to go home from work, that he had not picked up son from school, and that he would contact law enforcement if he found son at home. Father thereafter failed to answer calls from law enforcement, and he was not at home when law enforcement went to his residence. When father eventually contacted law enforcement about three hours later, he initially denied having son with him. After confronting father with information indicating that he was in the same area in San Ramon as daughter, who herself had reported to law enforcement that she was with her brother, father finally admitted that son was with him. Father later acknowledged to law enforcement that he found daughter and son at his

15

residence, that he took both to San Ramon so daughter could visit a friend, and that he should not have taken son out of the county. Father indicated that he was going to take the children to his home, and he agreed with law enforcement to contact mother in the morning and return son. However, father instead sent a text message to mother and a social worker that same night, indicating that he believed the custody arrangement allowed him to keep son if son so desired.

The following day, law enforcement went to father's residence, where son was still located. Father acknowledged that he had not returned son to mother. Father also acknowledged that the document that he was relying on to justify his continuing custody of son was not a court order.

According to the sheriff's report, father was on active probation during this time period after being convicted in Butte County of violating Penal Code section 278 [child abduction], with probation having been transferred to Santa Cruz County. Father's probation terms required that he comply with the directives of child protective services regarding child custody. Law enforcement determined that when father found son at father's residence, father failed to contact mother and return son, and instead father deliberately took son out of Santa Cruz County. Father also deliberately chose to retain custody of son, despite law enforcement's direction to surrender son to mother and with father's understanding that the current child custody directive was overnight visitation with son on Wednesdays and Sundays only. Father was arrested and booked into jail for a probation violation. Mother picked up son. Mother knew daughter would stay in Santa Cruz with a friend, rather than stay with mother.

### 5. Contested Hearing Regarding 12-Month Review (December 6, 2023)

The contested hearing on family maintenance review was held on December 6, 2023. No party disagreed with the Santa Cruz Department's recommendation that dependency be dismissed for both children. Regarding custody and visitation exit orders, the department recommended that (1) the parents share legal custody of both children,

16

(2) the parents share physical custody of daughter, and (3) mother have full physical custody of son, with father having supervised visitation. Father and children contested the custody and visitation recommendations.

The juvenile court, without objection from the parties, allowed son and daughter to testify in chambers and outside the presence of their parents. (See § 350, subd. (b).) The children testified as follows:

Son was nine years old and in fourth grade. He testified that he wanted to live with father during the week plus two weekends each month, and that he wanted to live with mother for the other weekends. Son loved mother. However, son felt "more safe" with father than with mother. In explaining why, son indicated that first, mother's former boyfriend had been physically abusive to son and daughter. Son testified that mother told the boyfriend to leave after son and daughter had asked mother to do so. Second, son referred to formerly living in houses with needles and drugs when he was in first or second grade. Regarding his current house, son indicated that his 16-year-old half-sister was using "weed and other substances." His relationship with her was "good" but "not the greatest." Third, son testified that mother had lied a lot to him, such as saying he would never see his father even after a restraining order ended. Son also testified that mother had tried to prevent him from visiting father "four or five months" ago. When he was later asked whether there was anything "not safe" in mother's home now, son testified, "No." He testified that when he was at father's house, he (son) could speak a little more freely about what he wanted and needed. Son missed his sister "a lot" and testified that he would start to cry whenever he thought about her. She was one of the "big" reasons why he wanted to live with father.

Daughter was 13 years old and attended middle school. She did not believe that her behavior at school, which resulted in a recent suspension, was affected by whether she lived with mother or father. Daughter wanted to live with father and did not want to talk to mother. However, if "everybody really want[ed]" it, daughter was willing to have

visits with mother once a week or once every two weeks. Although daughter felt safer at father's house, she testified that a one-hour visit with mother "doesn't have to be supervised." Daughter testified that mother did not let her visit father for two weeks in August, and that she (daughter) had a physical altercation with mother, which resulted in daughter leaving the house. Daughter did not see any drugs or needles at her mother's current residence nor at her father's residence. However, she believed her mother was an alcoholic. Daughter loved her brother a lot and had a really good relationship with him. They had "been through everything together" and had "always been close." Daughter testified that her brother loved mother and that he was "not unsafe there" like daughter was.

After admitting various documents into evidence, including the Santa Cruz Department's October 2023 report for the 12-month review and the department's subsequent memorandum updating the court, the juvenile court heard argument from the parties.

The Santa Cruz Department contended that in making custody and visitation orders when a dependency case is being dismissed, the juvenile court was required to apply the best interest standard. The department further observed that if the juvenile court's orders needed to be modified in the future, the family would be able to "return to family court and seek modification should changes or the best interest of the children require it." The department observed that prior to the summertime altercation between mother and daughter, it was going to recommend dismissal with full custody to mother. Now, however, the department acknowledged that in view of the "13-year-old child who is willful and has her own mind," neither the department nor likely the parents "want to be in a situation of forcing her into a custody situation that she is not wanting at this point." For that reason, the department recommended shared custody for daughter. Regarding son, the department had hoped that "the best interest of the children would be served by having unsupervised visitation by [father] with [son]." However, the

department found "itself in a situation where it believes [son's] best interests are not served by having unsupervised time with his father." The department referred to the recent incident in which father took son out of the county without authorization and was not truthful to law enforcement who were trying to find son, and the "longstanding inability of [father] to consistently follow court orders and to kind of gather his children into a storm of consternation and disdain for their mother." The department also believed that son had been coached to state a specific custody and visitation arrangement. The department further argued that none of the testimony by the children indicated that mother was an unsafe person.

Counsel for the children contended that "[b]oth parents are safe parents, both parents have been doing their service plans." Counsel argued that mother had interfered with the children's relationship with father, prevented visitation with him, and stated in the past that they would never see their father again. Counsel contended that while the department was focused on whether father would follow court orders, the children were thinking about whether mother would follow court orders. Counsel indicated that the children believed that "neither parent is particularly good at co-parenting," and that under these circumstances, daughter "has been very clear that if she can't be co-parented, she wants to be parented by her father." Counsel acknowledged that son "loves both parents and he wants both in his life." Counsel disagreed that son had been coached, arguing that he was an articulate child, had "lived through a lot," and "if there have been 40 court hearings in this case, . . . the kids are very aware of custody issues and visitation issues." Regarding son's desire to be with father during the week and mother on weekends, counsel stated about son, "I think he was feeling in that negotiating peace [sic] of I am going to ask for more because I am worried I am going to get half. He very much wants to spend time with both parents and does not see, in any way, why it needs to be supervised with his father. He feels extremely safe with his father and you heard he mentioned he feels safer with his father than mother. But he loves his mother and does

want to see her and spend time with her." Counsel further stated, "One of the reasons I would submit to the Court, the benefit of having [son] visit with father during the week, there are a lot of eyes and ears, if there are concerns as Department outlines he is at school, there will be other people who will see him, that he can speak to, and that would alert the mother or any other party if he is not turned up at school or if he's tearful at school or if there are problems at school and issues with his father." Counsel also referred to the "extremely strong" bond between the siblings, that they had "been through a lot" together, and that daughter was son's "safest person." Counsel expressed concern about the absence of exit orders regarding sibling visitation and believed that son's current one-hour per week supervised visit with father did not amount to "quality time between [son] and [his sister]." Counsel concluded by saying that son was "safe with both of his parents" and that "a 50 percent time share is what would be in the best interest." Counsel stated that the "biggest problem" would be "getting both parents to honor the Court orders."

Mother's counsel contended that mother was a safe parent, as reflected in the social worker's assessment and mother's progress in participating in her case plan. Counsel requested that the court follow the department's recommendation regarding custody and visitation.

Father's counsel contended that "both parents are safe parents," that the children were "quite clear" about what they wanted, and that "the sibling bond in this case is very strong and these children do want to be together." Counsel requested that father have custody of both children and that son have visitation with mother every other weekend.

### 6. Juvenile Court's Findings and Orders (December 7, 2023)

At the continued hearing on the following day, December 7, 2023, the juvenile court issued its findings and orders. The court stated that "[t]his is not an easy case" but agreed with the Santa Cruz Department that "continued welfare involvement is in itself detrimental for [daughter] and [son]." The court stated that the parents "really need to

work on co-parenting skills" and that their "inability to co-parent is doing a disservice to [their] children and the relationship that [the parents] have with [their] children."

The juvenile court observed that the Santa Cruz Department was "recommending supervised visits for [son] and [father], and [the court] appreciate[d] the recommendation." Addressing father, the court stated: "[Y]ou're currently on probation for absconding with your children, yet, you voluntarily took [son] out of the county knowing that [mother] was concerned about his whereabouts, and contacted law enforcement about that concern. [¶] You talked to law enforcement saying you didn't know where [son] was, and I agree initially you didn't know for certain [son] went to your home with [daughter]. You blatantly disregarded the visitation orders and even the directives of law enforcement and took [son] out of the county. [¶] Once you finally responded to law enforcement you lied again. You said you didn't know where [son] was when you were the one that drove him out of the county. You then agreed to return to Santa Cruz County that night and return [son] to [mother] in the morning, and you didn't; and you tried to pretend you didn't understand the visitation order, and ultimately you were arrested for these actions. [¶] . . . [H]owever, you also during the process did eventually do what the Department asked of you so they could find you to be a safe parent as they found [mother] a safe parent. You tested, [you're] doing therapy, you obtained safe housing and they feel you are safe as a parent to care for [daughter]."

The juvenile court indicated that it did not believe it was in the best interest of son, or daughter, to restrict father's visitation with son to one to two hours per week on a supervised basis. The court found that it was "in the best interest of [daughter] and [son] to stay connected to one another and keep their bond. It is also in their best interest to have regular contact with both of their parents." The court stated that "[u]nfortunately, the relationship between [daughter] and [mother] right now is very broken." Based on the daughter's statements to the court the prior day, the court observed that "it appears she is willing to work on the relationship and is open to some visitation with her mother."

21

The court expressed "hope that the ordered visits will be utilized to mend the relationship," explaining that this relationship was "in the best interest of [daughter] herself."

The juvenile court dismissed the dependency case as to each child. With respect to custody and visitation, the court made the following orders: Regarding daughter, the parents would share legal and physical custody, daughter's primary residence would be with father, and mother and daughter would have one-hour visitation on Tuesdays with daughter having the option to extend the visitation time. Regarding son, the court ordered that the parents would share legal custody, mother would have physical custody, and son's primary residence would be with mother. Father and son would have unsupervised visitation the first, second, and fourth weekend of every month, beginning after school Friday through Monday morning drop off at school. For the third weekend and any fifth weekend of the month, father and son would have visitation the preceding Wednesday after school through Thursday morning drop off at school. When school was not in session, the visitation exchange would occur at a specified place, and father's Wednesday visits would end at 9:00 p.m.

After issuing the orders, the juvenile court stated the following to son: "I am sorry . . . it's not exactly what you wanted. However, I did change it so it's not just supervised visits. I did take what you said to me to heart yesterday, when I was trying to make the decision, and I did do something differently than the Department was recommending. [¶] So you're going see your father unsupervised at least three weekends a month and you will be able to have an overnight during the week, then when your sister is visiting with your mom, that will not interfere with your time with your dad, so you can still see your sister during those days. Okay." Son responded, "Okay." The court further stated to son, "And hopefully as your parents and you guys move through this, maybe other orders will be worked out."

The juvenile court's final judgments, which included the custody and visitation orders, were filed December 7, 2023.  (See § 302, subd. (d).)  Father filed notices of appeal on December 12, 2023.

## III.    DISCUSSION

Father contends that it was not in son's best interest to live with mother and that the juvenile court therefore abused its discretion in granting her sole physical custody of son.  The Santa Cruz Department argues that father fails to establish an abuse of discretion and that substantial evidence supports the juvenile court's determination that son's physical custody and primary residence with mother were in his best interests.  Mother has filed a letter joining in the Santa Cruz Department's brief and requesting that this court affirm the juvenile court's orders.

### A.  *Legal Principles Regarding Custody and Visitation Exit Orders*

" 'When the juvenile court terminates its jurisdiction over a dependent child, section 362.4 authorizes it to make custody and visitation orders that will be transferred to [a] . . . family court file and remain in effect until modified or terminated by the superior court.' "  (*In re Chantal S.* (1996) 13 Cal.4th 196, 203; see §§ 362.4, subds. (a), (b) & (c), 302, subd. (d).)  Such custody and visitation orders upon termination of dependency jurisdiction are often referred to as " 'exit orders.' "  (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1122.)

"When making a custody determination in any dependency case, the court's focus and primary consideration must always be the best interests of the child.  [Citations.]"  (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268.)  In making this determination, the court must consider "the totality of the circumstances."  (*In re J.M.* (2023) 89 Cal.App.5th 95, 112.)  "Furthermore, the court is not restrained by 'any preferences or presumptions.'  [Citations.]"  (*In re Nicholas H.*, *supra*, at p. 268.)  "Because juvenile dependency proceedings arise when children are subject to or at risk of abuse or neglect,

23

'[t]he presumption of parental fitness that underlies custody law in the family court just does not apply. . . . Rather the juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions.' [Citations.]" (*In re J.M.*, *supra*, at p. 112.) "Thus, for example, a finding that neither parent poses any danger to the child does not mean that both are equally entitled to half custody, since joint physical custody may not be in the child's best interests for a variety of reasons. [Citation.] By the same token, a finding that the parent from whom custody was removed no longer poses a risk of detriment or that the parent whose custody has been subject to supervision no longer requires supervision is relevant to, but not necessarily determinative of, the best interests of the child." (*In re Nicholas H.*, *supra*, at p. 268.) "In any custody determination, a primary consideration in determining the child's best interests is the goal of assuring stability and continuity. [Citation.] 'When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role. That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child.' [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)

A " 'juvenile court has broad discretion to make custody orders when it terminates jurisdiction in a dependency case.' [Citation.]" (*In re N.M.* (2023) 88 Cal.App.5th 1090, 1094.) We review such custody orders for abuse of discretion. (*Ibid.*; see *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300-301.) Under this standard, an appellate court " ' "will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." ' [Citations.]" (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318.) "[W]e must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings where there is substantial evidence to support them. [Citation.]" (*In re M.V.* (2014) 225 Cal.App.4th 1495, 1506-1507 (*M.V.*).) " ' "The appropriate test

for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' [Citations.]" (*Stephanie M.*, *supra*, at pp. 318-319.)

**B.** *Analysis*

Father contends that the juvenile court's order granting mother sole physical custody of son was an abuse of discretion and not in son's best interest. Father argues that he was a safe parent, that son wanted to live primarily with him, and that "it was important for [daughter] and [son] to be together." Father requests that the custody order regarding son be reversed and that "the matter remanded to the family court for a new custody hearing to properly weigh whether shared physical custody with primary residence with father was in the minor's best interests."

We determine that father fails to demonstrate that the juvenile court abused its discretion in ordering physical custody of son to mother, with significant visitation to father.

The dependency case arose in August 2022, based on father, among other things, (1) dissuading his children from cooperating in a forensic interview concerning abuse, (2) leaving the children without any provisions for care and support upon his arrest, and (3) upon his release, removing the children from their placement and not disclosing their whereabouts. Father continued to engage in similar behavior as recently as November 2023, just one month prior to the juvenile court's December 2023 exit orders regarding custody and visitation. As the juvenile court recounted in rendering the exit orders, father at the time of the November 2023 incident was already on probation for absconding with the children when he (1) took son out of the county in violation of visitation orders and with the knowledge that law enforcement was looking for the child, (2) lied to law enforcement by indicating that he did not know where the child was, and (3) failed to return son to mother the next morning contrary to his agreement with law enforcement to

25

do so.[4]  This most recent incident resulted in father being arrested and booked into jail for a probation violation.  Moreover, just one month prior, in October 2023, father picked up son outside of the authorized visitation schedule and son did not attend school the following day.  The record thus reflects that father instigated or, at a minimum, facilitated son leaving his placements, including his placement with mother.

On the other hand, regarding mother, by November 2022 and continuing through December 2023 when the dependency was dismissed, son was in her physical care.  Both son and daughter had been doing well in mother's care and in school, prior to father relocating to the Santa Cruz area and prior to being granted unsupervised visits at the end of June 2023.  Following the August 2023 incident between mother and daughter, and after daughter's continued refusal to see mother, daughter came into the continuous care of father.  During this time, daughter struggled in school, including being defiant, starting a fight, and being suspended for having a vape device.  In contrast, although son had a "hard start" at the beginning of the school year, his attitude improved while he continued in mother's care.

The record reflects that stability and continuity was provided to son while he remained in mother's physical care in the year leading up to the exit orders.  At the same time, father created and fostered conflict, instability, and a lack of continuity by repeatedly taking, retaining, and/or hiding son outside of authorized visitation, including as recently as one month before the exit orders were issued, and during the course of which father lied to law enforcement and was arrested for an apparent probation

---

[4] On appeal, father asserts that in this November 2023 incident, "[m]other mislead [sic] law enforcement by reporting that father was not allowed to have unsupervised visits with [son] and escalated the situation."  Father's record citation for this assertion pertains to the October 2023 incident, not the November 2023 incident.  Further, in the October 2023 incident cited by father, the record reflects that father took son outside of father's authorized visitation time and, although "there was no safety concerns with [son] being with [father]" at the time, both law enforcement and the social worker "agreed that [son] needed to return home to [mother]."

violation. On this record, we cannot conclude that the juvenile court's order continuing son primarily in mother's care by granting her physical custody of son was an " ' "arbitrary, capricious, or patently absurd determination." ' " (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318; see *id.* at p. 317 [a child's need for continuity and stability " 'will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child' "]; *In re John W.* (1996) 41 Cal.App.4th 961, 974 [a "child's best interests are not necessarily served by shuttling between two parents"].)

We are not persuaded by father's contentions to the contrary.

First, in reference to son's stated preference to primarily reside with father rather than mother, father cites various legal authorities for the proposition that a court is required to consider a child's preferences regarding custody and visitation if the child is mature enough. However, assuming these legal authorities apply in the dependency context, father also acknowledges that although "the court should consider a child's preferences, the court is *not* required to follow them." (Italics added.)

Second, in this case, although the custody and visitation orders did not result in the exact schedule requested by son, the juvenile court expressly recognized *and* gave weight to son's testimony that he wanted to spend more unsupervised time with father, and the court also expressly recognized *and* gave weight to both children's testimony regarding their sibling bond. In this regard, the court explained to son, "I am sorry . . . it's not exactly what you wanted. However, I did change it so it's not just supervised visits. I did take what you said to me to heart yesterday, when I was trying to make the decision, and I did do something differently than the Department was recommending." The court also expressly found that it was "in the best interest of [daughter] and [son] to stay connected to one another and keep their bond. It is also in their best interest to have regular contact with both of their parents." In accordance with these statements, the court declined to adopt the Santa Cruz Department's recommendation to restrict father's visitation time with son and to require supervision. Instead, the court expanded father's

visitation to include three unsupervised weekends a month, plus visitation on the Wednesday preceding the weekend that son did not visit father, with this Wednesday visit to include an overnight stay depending on whether school was in session.[5]  Further, as the court explained to son, daughter's weekly Tuesday visits with mother would "not interfere with [son's] time with [father]" on the specified Wednesdays and weekends, and thus the children would be able to see each other both when son was visiting father and when daughter was visiting mother.[6]  In view of this record, father fails to demonstrate that the court's order granting physical custody of son to mother with significant unsupervised visitation to father was "influenced by an erroneous understanding of applicable law or reflect[ed] an unawareness of the full scope of its discretion."

Third, father, in arguing that the juvenile court abused its discretion in "rejecting the suggestion of minor's counsel for a 50/50 physical custody arrangement for [son]," points to various facts, such as son exhibiting stress, anxiety, and emotional upset when a social worker informed him that he would be going home with mother after school in early November 2023; son's testimony that he felt safer with father because he could "speak a little bit more freely about what [he] want[s] and what [he] need[s]"; and mother's prior conduct in taking the children to Arkansas.

The record, however, also indicates that counsel for the children acknowledged the Santa Cruz Department's concerns about father.  In this regard, the children's counsel in arguing for shared physical custody stated, "One of the reasons I would submit to the Court, the benefit of having [son] visit with father during the week, there are a lot of eyes

_____

[5] We also note that there was evidence in the record from which the juvenile court could infer that it was father's manipulation of daughter that exacerbated the mother-daughter estrangement.  Given such evidence and the inferences the juvenile court could have drawn in support of the Santa Cruz Department's recommendation for supervised visitation, we do not believe that the juvenile court failed to appreciate the full breadth of its discretion.

[6] Nothing in the record supports father's contention that the juvenile court and/or county counsel called son "a liar or just ignore[d] what [he] said."

and ears, if there are concerns as Department outlines he is at school, there will be other people who will see him, that he can speak to, and that would alert the mother or any other party if he is not turned up at school or if he's tearful at school or if there are problems at school and issues with his father." Further, although son was upset when he was initially told that he would be in mother's care after school in early November 2023, the record reflects that later that evening, he was " 'a lot more relaxed' " at home with mother, and the pair had exchanged " 'I love you['s].' " Moreover, while son testified that he felt safer with father, when he was asked whether there was anything "not safe" in mother's home now, son testified, "No." Daughter similarly testified that her brother was "not unsafe there." Indeed, even father (through counsel) acknowledged at the conclusion of the contested hearing that mother was a safe parent. Regarding mother taking the children to Arkansas for a period of time, we acknowledge the severity of mother's misconduct but we observe that this incident occurred before the instant dependency proceeding was initiated, and no concern has since been raised about mother absconding with the children. The juvenile court was within its discretion in concluding that mother's flight to Arkansas represented an isolated episode of misconduct. Significantly, on this record, where conflicting inferences might arise from the evidence, "we must indulge all reasonable inferences to support the decision of the juvenile court" (*M.V.*, *supra*, 225 Cal.App.4th at pp. 1506-1507), and we have " ' "no authority to substitute [our] decision for that of the trial court" ' " (*Stephanie M*., *supra*, 7 Cal.4th at p. 319).

Fourth, father suggests that his violation of visitation orders by taking or keeping son outside of authorized visitation were "protective actions." Nothing in the record indicates that son was in fact unsafe in mother's care in either the October or November 2023 incidents. Indeed, father's lying to law enforcement and his failure to disclose son's location in the November 2023 incident permitted the juvenile court to infer that father's

violations of the court orders were in bad faith and not prompted by considerations of son's best interest.

In sum, father fails to demonstrate that the juvenile court abused its discretion in concluding that it was in son's best interest to award sole physical custody to mother with significant visitation to father.

## IV.   DISPOSITION

The final judgments of December 7, 2023, are affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
GROVER, J.

_____
LIE, J.

*In re C.F. et al.; Santa Cruz County HSD v. M.F.*
**H051649**